IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Steven Carr, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Ray Holt, Regional Director of Bureau of | ) | Civil Action No. 6:06-2333-TLW-WMC |
| Prisons; Harrell Watts, Central Office | ) | |
| Administrator; John J. Lamanna, Warden of | ) | |
| FCI-Edgefield; L. Fuertes-Rosario, Health | ) | |
| Services Administrator at FCI-Edgefield; | ) | **REPORT OF MAGISTRATE JUDGE** |
| E. Faytong, Physicians Assistant at FCI- | ) | |
| Edgefield; L. Guevarh, Assistant Medical | ) | |
| Services Administrator at FCI-Edgefield; | ) | |
| A. Saha, Physicians Assistant at FCI- | ) | |
| Edgefield; J. Lopez, MLP at FCI-Edgefield; | ) | |
| R. Blocker, MLP at FCI-Edgefield; J. Serrane; | ) | |
| A. Williams, X-Ray Technician; NFN Turner, | ) | |
| Food Service Administrator; A. Stacks, | ) | |
| Assistant Food Service Administrator; NFN | ) | |
| Mahones, Unit Manager; NFN Boltin, | ) | |
| Counselor; NFN Vinning, Lieutenant; NFN | ) | |
| Lovegrove, Food Service Foreman; and | ) | |
| Thomas C. Davis, Food Service Supervisor | ) | |
| at FCI-Edgefield, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The plaintiff, a federal prisoner proceeding *pro se*, seeks relief pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The defendants filed a motion for summary judgment on January 12, 2007. By order filed January 16, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. On February 2, 2007, the plaintiff filed a response to the motion. The defendants filed a reply on February 5, 2007.

The plaintiff is incarcerated at the Federal Correctional Institution ("FCI") in Edgefield, South Carolina. He is serving a 30-year sentence for violations of 21 U.S.C. §§ 841(a)(1) and 846 (possessing with intent to distribute cocaine base and conspiracy to possess with intent to distribute cocaine base). His projected release date, with good time, is January 3, 2030. The plaintiff names the following Bureau of Prisons staff as defendants: Ray Holt, Southeast Regional Director; Harrell Watts, National Inmate Appeals Administrator; John J. LaManna, Warden at FCI Edgefield; Luisa Fuertes-Rosario, Health Services Administrator at FCI Edgefield; Eduardo Faytong, who is a Mid-Level Practitioner with the Public Health Service who was assigned to FCI Edgefield from September 2004 through June 2005; Lorenzo Guevara, Supervisory Mid-Level Practitioner; Arunava Saha, Mid-Level Practitioner at FCI Edgefield; Jose Lopez, former Mid-Level Practitioner at FCI Edgefield that left in August 2005; Dr. Rex Blocker, Medical Officer; Dr. Jose Serrano, former Clinical Director who retired on October 26, 2006; Amy Williams, Budget Analyst and X-Ray Technologist; Sharryl Turner, who transferred to FCI Edgefield as the Food Service Administrator on November 14, 2005; Anthony Stacks, Assistant Food Service Administrator; William Mahomes, Unit Manager; John Boltin, Correctional Counselor; Kayle Vining, Lieutenant; Gary Lovelace, who is a Food Service Foreman; and Thomas Davis, Food Service Supervisor.

The plaintiff alleges the defendants violated his constitutional rights with respect to the medical treatment and care he received for his left wrist. More specifically,

2

he alleges he injured his left wrist on September 23, 2004, when he slipped and fell on a wet floor while pulling a pallet of food in the Food Service Storage Room. He contends when he was taken to medical, he was told by medical staff his wrist was sprained; therefore, an x-ray was not taken. The plaintiff states he continued to complain to medical staff over a period of four months that he was in severe pain and forced to work. He alleges when an x-ray was finally ordered, it was discovered his wrist was broken rather than sprained. He states his wrist was placed in a cast, but the pain continued, and he was forced to work. He also states he was given an incident report by his work supervisor, which resulted in his receiving disciplinary sanctions. The plaintiff seeks a judgment finding the defendants have been indifferent to his health issues and provided faulty medical treatment violating the Eighth Amendment ban on cruel and unusual punishment. He also claims he suffered permanent damage due to the negligence of medical and kitchen staff.

## FACTS PRESENTED

On September 23, 2004, at approximately 11:30 a.m., the plaintiff fell down on a pallet while working in the Food Service Warehouse (def. m.s.j., ex. 9, pl. medical records, p. 27; ex. 10, Blocker decl.). The plaintiff notified his supervisor, defendant Lovelace, and he was sent to the Health Services Department. The plaintiff was examined by defendant Guevara and found to have only minimal tenderness and no deformity or indication of a possible fracture. The diagnosis was an abrasion of the forearm and a sprained wrist. Minor first aid was provided by defendant Guevara. Additionally, defendant Guevara provided the plaintiff with an ace wrap with instructions to apply ice to his wrist.

The plaintiff did not report back to the Health Services Department complaining of pain in left wrist until October 7, 2004 (def. m.s.j., ex. 9, p. 28-29; ex. 10; ex. 11, Faytong decl.). At that time, he was seen by defendant Faytong and demanded other treatment. The medical record indicates the plaintiff noted his pain as a "1" on the pain

management scale, indicating he was not in much pain.  The examination by defendant Faytong revealed no gross deformity, with range of motion, coordination, and capillaries within normal limits.  The plaintiff was assessed with a left wrist injury.  The plaintiff was told to return if his symptoms worsened.

The plaintiff missed his scheduled sick call appointment on November 18, 2004 (def. m.s.j., ex. 9, p. 29; ex. 10).  On December 3, 2004, the plaintiff was seen during sick call with complaints of persistent pain in left wrist since he fell approximately three months prior (*id*. p. 30-32).  Nurse Practitioner Frac examined the plaintiff and noted he had a decreased range of motion in his left wrist with pain.  An x-ray of the plaintiff's left wrist was ordered, and he was told to keep the wrist immobilized with the splint until further diagnostics were completed.  On this same day, defendant Williams x-rayed the plaintiff's left wrist.  On December 8, 2004, the plaintiff saw a consultant orthopedic specialist.  Physical examination revealed tenderness and a navicular fracture of the left wrist (*id.* p. 32-33).  The orthopedist recommended a thumb spica cast on the plaintiff's left wrist.  He recommended a follow-up with him in six weeks for cast removal and another x-ray to make sure the fracture was healed.  The orthopedist also noted that the plaintiff may need re-casting for an additional six weeks.  Defendant Lopez applied a thumb spica cast as recommended on the plaintiff's left wrist (*id.* p. 33-35).

On December 24, 2004, the plaintiff reported to the Health Services Department complaining that the cast had gotten wet from the rain and was soft (*id.* p. 36).  The plaintiff reported his pain was a "2" on the pain assessment scale.  The cast was reinforced by nurse practitioner ("NP") Hamme since the plaintiff was scheduled to have his cast removed in two weeks.  The plaintiff was told to follow up as ordered.

On December 29, 2004, NP Hamme noted while he was on the compound he saw the plaintiff, who told him the cast was loose again (*id.* p. 36).  At that time, the plaintiff still had the cast on.  The Nurse Practitioner told the plaintiff to have the officer call

4

the duty Physician's Assistant so he could be seen.  On December 30, 2004, the plaintiff signed up for sick call but did not return for his appointment.  When medical staff called his housing unit, the plaintiff told them he took his cast off.  On the same day, Clinical Nurse Nelson noted that the plaintiff came to Health Services Unit at approximately 6:30 a.m. to sign up for sick call.  The nurse noted there was no cast on the plaintiff's left wrist.  The nurse also noted the plaintiff was being noncompliant toward his treatment by removing the cast himself, which put him at risk for continued trauma to the wrist (*id.* p. 37).

On January 11, 2005, the plaintiff was seen in the Health Services Unit by defendant Guevara, who noted that the plaintiff had recently removed the reinforced cast from his left wrist, was still experiencing pain, and requested a refill of his stomach medication (*id.* p. 38).  An examination revealed no deformity, minimal tenderness, and no effusion.  The plaintiff was assessed with a navicular fracture and described as non-compliant because he removed his cast against medical advice.  The stomach medication was refilled as requested.  Defendant Guevara ordered another x-ray of the plaintiff's wrist as recommended by the orthopedic specialist.  The x-ray was taken by defendant Williams the same day and defendant Guevara applied a new cast.  The plaintiff was instructed to wear the cast and not remove it for any reason until he was seen again by the orthopedic specialist.  He was told to follow up by sick call if needed (*id.* p. 39).

On January 19, 2005, the plaintiff was seen by the orthopedic specialist (*id.* p. 39-41).  At that time, the x-ray that was taken on January 11, 2005, was reviewed by the orthopedist, who found the fracture had not healed.  The orthopedist recommended continuing with a thumb spica cast for six more weeks and x-ray again after that.  The orthopedist noted if the fracture had not healed by his next consultation, he would consider referring the plaintiff to see if he was a candidate for a navicular bone graft (*id.* p. 42).

On March 2, 2005, an x-ray of the plaintiff's left wrist was taken by defendant Guevara without removing the cast in anticipation of the next orthopedist visit (*id.* p. 45, 46).

5

However, additional views were needed because the cast obscured the area. The plaintiff was directed to return at a later date for the x-rays. Defendant Guevara noted in his medical record that additional views needed to be taken prior to the plaintiff seeing the orthopedic specialist again and that the films should be sent with the plaintiff at the time of his appointment so the x-ray could be reviewed by the specialist (*id.*).

On March 4, 2005, defendant Guevara noted the orthopedic specialist called and ordered the plaintiff's cast to be removed and an x-ray of his left wrist taken before the scheduled March 9, 2005, appointment (*id.)*. The note also indicated that the plaintiff had removed his cast himself for the second time on March 4, 2005, prior to his reporting to the Health Services Unit for his scheduled appointment. Later on this same day, the plaintiff reported to the Health Services Unit, and an x-ray of his left wrist taken by defendant Williams (*id.)*. As happened on January 19, 2005, the orthopedist noted that the bone had not yet healed (*id.* p. 48-9). He recommended casting for an additional six weeks with x-ray to follow. Thereafter, he planned to refer the plaintiff to a hand specialist to consider a navicular graft if appropriate (*id.*). On March 10, 2005, defendant Guevara noted that the plaintiff was given a thumb spica cast (*id.* p. 45). The note indicated the plaintiff was instructed to keep the cast dry and to watch call-out in six weeks for the cast to be removed (*id.*).

On April 7, 2005, the plaintiff signed up for sick call complaining that his stomach and left hand both hurt (*id.* p. 51). The plaintiff was seen during medical triage by Nurse Hobbs and given an appointment for April 8, 2005. An administrative note was made by defendant Williams this same date, stating that the plaintiff stopped defendant Williams in the waiting room and showed her his cast, where he had applied tape to the thumb/wrist portion of the cast. Defendant Williams noted that the cast appeared to be solid and the plaintiff's fingers showed no signs of circulation problems. She instructed him to "quit messing" with the cast (*id.* p. 52).

6

On April 8, 2005, the plaintiff was seen during sick call by defendant Faytong complaining of mild wrist pain (*id*. p. 53-4; def. m.s.j., ex. 11).  He denied reinjuring his wrist and was not on any pain medication.  The examination revealed the plaintiff's cast was in place and that the fingers had no gross deformities, no swelling, and 100% range of motion. The plaintiff was given a pain medication and told to followup if needed (*id.*).  On April 11, 2005, defendant Saha noted the plaintiff was given a two-week medical convalescence so he would not have to work with his cast on (def. m.s.j., ex.9, p. 54 and ex. 10).  The plaintiff was instructed to keep his cast on until his next evaluation by the Health Services staff.  On April 11, 2005, the plaintiff was issued a medical convalescence to stay off work for approximately two weeks (*id.* p. 50-54).

On April 20, 2005, the plaintiff had his yearly Food Handler's Examination (*id.* p. 56; ex. 11).  During this examination, defendant Faytong noted that the plaintiff had a left wrist fracture.  Defendant Faytong noted the plaintiff would not be cleared to work in the Food Service Department until after the plaintiff was cleared by the orthopedic specialist (*id.* p. 56-57).

On April 27, 2005, defendant Serrano ordered an x-ray of the plaintiff's left wrist injury to be done prior to his impending visit with the orthopedist (def. m.s.j., ex. 9, 10). Defendant Williams took the x-ray as ordered by defendant Serrano.  Later the same day, the plaintiff was seen by the orthopedic specialist, who found no navicular tenderness.  The orthopedist noted that the x-ray showed the navicular had healed and recommended a soft wrist splint and for the plaintiff to begin range of motion wrist exercises.  He was also instructed to avoid heavy lifting and told to return for a follow-up visit in two to three months (def. m.s.j., ex. 9 p. 58).

On April 28, 2005, defendant Guevara noted the plaintiff was issued a soft wrist splint (*id.* p. 57).  The plaintiff was educated about his medical convalescence and how to do the range of motion wrist exercises as recommended by the specialist.  The plaintiff

7

indicated to defendant Guevara that he understood (*id.*).  On June 16, 2005, the plaintiff signed up for sick call, requesting more pain medication (*id.* p. 61-62).  The plaintiff was seen during medical triage by Nurse Hobbs and given an appointment for June 30, 2005.  Nurse Hobbs also advised the plaintiff to sign up for sick call 7 to 10 days prior to expiration of date of medication (*id.*).

On June 29, 2005, the plaintiff injured his left wrist when he was "hopping over the fence" (*id.* p. 63).  Examination by defendant Saha revealed the plaintiff had mild tenderness, a good range of motion, and pain on extension of the wrist.  The plaintiff was assessed a left wrist sprain and ordered an x-ray.  The plaintiff was advised to continue to wear his wrist splint (from his previous left wrist injury) and return as needed.  The plaintiff declined to take any pain medication (*id.*).  On this same day, defendant Williams took an x-ray of the plaintiff's left wrist, which was reviewed by defendant Serrano (*id.* p. 64).  The x-ray was also sent to a radiologist for an official reading.  The x-ray revealed a slight irregularity of the navicular but there was no evidence of an acute injury or fracture identified on the x-ray.  The radiologist recommended a follow-up if the plaintiff's symptoms worsened (*id.*).

On July 19, 2005, the plaintiff signed up for sick call again, complaining he was still having problems with his hand that was broken (*id.* p. 70-71).  He was seen during medical triage by defendant Saha and given an appointment for August 4, 2005 (*id.*).  On July 25, 2005, the plaintiff was seen in the Health Services Unit by defendant Guevara with concerns about his wrist and wanting to know the x-ray results (*id.* p. 72-73.).  He complained his wrist was sore and stiff in the morning.  He noted his pain was a "2" on the pain management scale.  Examination by defendant Guevara revealed the plaintiff's left wrist had good range of motion with no deformities or crepitus.  He was assessed with an old injury to the left wrist and the current x-ray showed no acute fracture.  The plaintiff was given medication for pain to take when needed (*id.*).

On July 27, 2005, the plaintiff was seen by the orthopedic specialist for another follow-up.  The plaintiff claimed he was still having pain and tenderness in his hand.  The orthopedist noted the plaintiff lacked some dorsiflexion (ability to bend wrist upward), volar flexes 10 degrees (bends wrist downward), and had some tenderness over the scapholunate joint (where the two wrist bones come together). The orthopedist's assessment of the x-ray showed the plaintiff had a little scapholunate disassociation (the two bones were further apart than usual).  The orthopedist recommended the plaintiff have an MRI of the left wrist and that he continue doing range of motion exercises (*id*. p. 73, 75).

On July 31, 2005, the plaintiff injured his right little finger when he was closing the door to the dryer in the housing unit (*id.* p. 73-74).  He was seen by defendant Saha and provided minor first aid and instructed to return as needed (*id.*).

On August 3, 2005, defendant Fuertes-Rosario noted the orthopedist's dictation notes were received at the institution (*id*. p. 77).  On August 4, 2005, the plaintiff signed up for sick call to inquire about left wrist follow-up (*id.*).  Defendant Saha advised the plaintiff was seen by the orthopedist on July 27, 2005, and a MRI was recommended.  The plaintiff stated he understood he was waiting to be scheduled to have a MRI.  No further appointment was necessary.

On September 12, 2005, the plaintiff signed up for sick call, complaining of continued problems with his left hand, stating he could not move his hand without pain (*id.* p. 78-79).  The plaintiff was seen during medical triage by Nurse Rogers  and given a sick call appointment for September 19, 2005.   He did not show up for his scheduled appointment (*id.*).

On September 29, 2005, the plaintiff signed up for sick call, seeking a refill of his stomach medicine and claiming his hand still hurt (*id.* p. 80-81).  The plaintiff was seen during medical triage by Nurse Rogers and given an appointment for October 17, 2005 (*id*.).  On October 17, 2005, the plaintiff was seen in the Health Services Unit by defendant

9

Guevara for a sick call appointment (*id*. p. 82-83).  He stated his left wrist was "not quite back to where it was" and the orthopedist had recommended he do range of motion exercises.  The plaintiff did not indicate he was in any pain.  He demonstrated the range of motion exercises recommended by the orthopedist.  He was given a refill on his stomach medication.

On October 31, 2005, the plaintiff signed up for sick call, complaining that his hand hurt when he moved it (*id*. p. 84).  He was seen during medical triage by defendant Saha and given an appointment for November 10, 2005.  On November 9, 2005, the plaintiff had an MRI of his left wrist (*id*. p. 89).  On the next day, November 10, 2005, he was seen for his sick call appointment by defendant Fuertes-Rosario (*id.* p. 87-88).  He continued to complain of having pain in his left wrist.  He stated he could not do the range of motion exercises.  The plaintiff was wearing a splint on his left wrist and had limited range of motion.  Examination indicated his 's wrist was mildly tender to the touch.  He plaintiff was given a new wrist splint and told to wait for a follow-up appointment to see the orthopedic specialist.

On November 16, 2005, the MRI was read by a radiologist (*id*. p. 89).  The MRI revealed the plaintiff had a non-displaced fracture of the scaphoid waist (one of the wrist bones was cracked but the pieces were still in place) without an osseous union (the bone pieces had not rejoined together solidly).  The scaphoid lunate ligament appeared intact and the signal within the radius was normal.  The MRI also showed the visualized muscles and tendons appeared unremarkable and the hamate hook was intact.

On November 17, 2005, the plaintiff signed up for sick call, requesting a refill of his stomach medication (*id*. p. 89-90).  He was seen during medical triage by defendant Saha and given an appointment for November 29, 2005, at which time he was given a refill of Zantac.  He did not complain about pain in his wrist.  On December 14, 2005, defendant Williams noted receipt of the orthopedic specialist's evaluation of the plaintiff's MRI (*id.* p.

10

93-95). He was concerned that the lunate had subluxed volarly (the lunate bone had moved around out of its usual position) and recommended the plaintiff be evaluated by a hand specialist to consider whether a proximal carpectomy or a fusion (procedures to either remove the bones or mechanically join them together) should be done. A consult was written to schedule the evaluation. It was set for January 12, 2006; however, it was cancelled due to a staff shortage at that particular time which raised a security concern for the plaintiff to go out for the consult (*id*. p. 93).

On February 14, 2006, the medical record revealed defendant Blocker received two telephone calls from officers who stated that the plaintiff was claiming he could not wipe tables because of his wrist injury (*id*. p. 96.). Defendant Blocker told the officers the plaintiff had an injury to his left wrist which would prevent him from wiping tables with it, but nothing was wrong with the plaintiff's right wrist. On February 15, 2006, defendant Serrano noted he reviewed the orthopedist's evaluation from December 14, 2005, to see if the plaintiff needed any specific medical restrictions. Defendant Serrano updated the plaintiff's medical restrictions to reflect he could not use his left hand but could still use his right hand.

On February 17, 2006, the plaintiff signed up for sick call, requesting a refill of his stomach medication (*id*. p. 97-99). He was seen in medical triage by Nurse Stevens and given a sick call appointment for February 27, 2006, at which time he was given a refill of Zantac (*id*. p. 102-03). On February 21, 2006, the plaintiff was seen by the orthopedic hand specialist (*id*. p. 100-01), who diagnosed the plaintiff with a left wrist scaphoid non-union (the bone was not joined solidly) that was about a year old. He recommended a right autogynour lliac crest bone graft to the left scaphoid (surgical procedure to take a piece of the right hip bone to place it in left wrist), which would be done on an outpatient basis. The specialist noted the plaintiff would need to wear a cast to immobilize his arm for about 16 weeks after the surgery. The surgery was scheduled for July 6, 2006 (*id*. p. 111). On

February 27, 2006, the plaintiff signed up for sick call, requesting better medication for his stomach.  He was seen during medical triage, and his Zantac was increased and he was instructed to return as needed.

On May 23, 2006, the plaintiff signed up for sick call, requesting more stomach medication and complaining his hand still hurt when moved.  He was seen during medical triage by Nurse Rogers and given a sick call appointment for June 5, 2006 (*id*. p. 105-06).  On June 5, 2006, he was seen in the Health Services Unit for his sick call appointment (*id*. p. 107).  The examination by defendant Guevara revealed the plaintiff's left wrist had a good range of motion and there was no swelling.  A wrist support was issued at this time to the plaintiff by defendant Guevara.

On July 4, 2006, the plaintiff was seen for a complaint of a sore on his neck (*id*. p. 109).  On July 6, 2006, the plaintiff was scheduled to have surgery on his wrist but the surgery was cancelled by the surgeon because the plaintiff had a sore on his forehead. Defendant Blocker indicated the institution was waiting on an explanation from the surgeon as to why he would not proceed forward with the surgery.  The surgery was rescheduled for September 21, 2006 (*id*. p. 111).

On August 15, 2006 the plaintiff was seen by the optometrist (*id*.).  On August 23, 2006, he was seen in the Health Services Department for a migraine.  On September 11, 2006, the plaintiff signed up for sick call, requesting a refill on his stomach medication.  He was seen during medical triage by Mid-Level Practitioner Link and given a scheduled appointment for September 21, 2006 (*id*. p.112-116).  On September 21, 2006, the plaintiff was sent to the outside hospital to have outpatient surgery on his wrist (*id*. p. 116).  The surgery was done and he returned to the institution the same day.

Defendant Guevara noted the following post operative care instructions: (1) keep hand elevated and ice on it for approximately three days; (2) return to the Health Services Department in three days to have the dressing removed; (3) no shower for three

days; (4) a medical convalescence for 30 days; (5) Tylenol #3 and regular Tylenol for pain for seven days; (6) follow-up with the hand specialist on September 27, 2006 (*id.*). On September 25, 2006, the plaintiff was seen by Nurse Barron for a follow-up visit and dressing change (*id.* p. 118). The plaintiff's splint and the dressing were removed. Examination revealed the surgical site was clean, dry with no edema, and closing well. There was no edema or drainage present on the dressing and the dressing was changed. The splint was replaced on his left wrist, and an ace bandage wrapped around it to keep it immobile. The dressing on the plaintiff's right lower abdomen was also changed.

On September 27, 2006, the plaintiff was seen by the orthopedic specialist for the recommended follow-up (*id.* p. 120). Examination revealed the bone graft was healing well and there was no sign of infection. He recommended the sutures come out on October 2, 2006, and the plaintiff be placed in a thumb spica cast. He recommended the case be removed after six weeks and the plaintiff's wrist x-rayed again to determine if the bone was healing properly. On October 2, 2006, the plaintiff reported to the Health Services Department to have his sutures removed (*Id.* p. 123). Nurse Barron examined the surgical site on the plaintiff's left wrist and noted it was healing well. She also noted the surgical site on the right lower abdomen of the plaintiff continued to drain. Nurse Barron removed the sutures on the left wrist and replaced the plaintiff's splint. She noted the sutures on the hip were not ready to come out, and the plaintiff was instructed to return on Friday for further evaluation. The medical record indicated the plaintiff understood.

On October 5, 2006, defendant Williams noted receipt of the report from the specialist's visit of September 27, 2006 (*id.*). Defendant Williams noted the specialist recommended the sutures be removed (which had already had been done) and that the plaintiff be placed in a thumb spical cast for six weeks. The plaintiff was placed on call out for October 6, 2006, to have the cast placed on his wrist (*id.*).

The plaintiff's medical records indicated he had his sutures from his right abdomen removed on October 6, 2006, by Nurse Barron and a thumb spica cast applied to his left wrist by defendant Guevara (*id*. p. 124). The plaintiff was instructed to wear the cast for six weeks and watch for a callout to see the specialist in six weeks. On November 27, 2006, the plaintiff's cast was removed by defendant Guevara and an x-ray was taken by defendant Williams. A wrist splint was applied to protect his wrist until he was seen by hand specialist on November 29, 2006 (*id*.).

On November 29, 2006, the plaintiff saw the orthopedist specialist, who examined his left wrist and the recent x-ray (*id*.) The specialist noted the wrist was healing properly and recommended the plaintiff wear the wrist splint for two more weeks. Defendant Guevara applied the wrist splint on the plaintiff's left wrist and instructed him to continue to wear the splint for two more weeks. The plaintiff verbalized he understood the instructions given to him by the specialist and defendant Guevara (*id*.).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

14

242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

The plaintiff makes no specific allegations against defendants Holt, Watts, LaManna, Guevara, Saha, Lopez, Blocker, Serrano, Williams, Turner, Stacks, Mahomes, Boltin, and Vining.  He alleges in a conclusory fashion that the defendants have been indifferent to his health issues and faulty medical treatment, which violated his Eighth Amendment rights.  He also alleges that he suffered permanent damage due to the

15

negligence of the medical and kitchen staff at FCI Edgefield. The plaintiff has failed to state a claim as to the violation of his constitutional rights by the above-referenced defendants.

The plaintiff's claims fail on the merits. He first alleges that the defendants were deliberately indifferent to his medical needs. Deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. § 1983 as constituting cruel and unusual punishment contravening the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Id.* at 102. This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical services. *Id.* The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Rogers v. Evans*, 792 F.2d 1052, 1058 (5th Cir. 1986). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

In order to establish that he has been subjected to cruel and unusual punishment, the plaintiff must prove that the deprivation of a basic human need was, objectively, sufficiently serious, and that, subjectively, the officials acted with a sufficiently culpable state of mind. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). What suffices as a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Courts have traditionally attempted to avoid intervening and dictating the medical care of prisoners. As

16

noted by the Fourth Circuit, courts should "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. . . .[which] remains a question of sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

With respect to the subjective component of deliberate indifference, while an "express intent to inflict unnecessary pain is not required . . . [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishment clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Mere disagreement between an inmate and a physician over the appropriate form of treatment is not an actionable constitutional claim. *Wright v. Collins*, 766 F2d 841, 849 (4th Cir. 1975).

The plaintiff makes specific allegations against three defendants: defendants Faytong, Fuertes-Rosario, and Davis. The plaintiff alleges that defendant Faytong, a Mid-Level Practitioner with the Public Health Service who was assigned to FCI Edgefield from September 2004 through June 2005, denied a request for an x-ray, even though the plaintiff was in obvious pain (comp. 4). A review of the plaintiff's medical records reveals that defendant Faytong examined the plaintiff on October 7, 2004, when he reported to the Health Services Department complaining of pain in left wrist and demanded treatment (def. m.s.j., ex. 10, p. 28-29; ex. 11). The medical record indicates the plaintiff noted his pain was a "1" on the pain management scale, indicating he was not in much pain. The examination by defendant Faytong revealed no gross deformity, with range of motion, coordination, and capillaries within normal limits. The plaintiff was assessed with a left wrist injury. There was no medical indication at this time that an x-ray was medically warranted. Defendant Faytong instructed the plaintiff to return if his symptoms worsened.

With regard to defendant Fuertes-Rosario, the plaintiff alleges he "continued to complain about the severe pain he suffered as he visited sick call, and requested an X-ray which was denied by Ms. Rosario," i.e., defendant Fuertes-Rosario. He does not state

17

he complained to defendant Fuertes-Rosario about being in severe pain; he states only that he requested an x-ray from her and she denied it.  There is nothing in the plaintiff's medical record that indicates he complained to defendant Fuertes-Rosario about being in severe pain or that he ever asked defendant Fuertes-Rosario for an x-ray.  Defendant Fuertes-Rosario, as the Health Services Administrator, was generally not involved in providing medical care and treatment to inmates (def. m.s.j., ex. 12).  More specifically, she was not involved in the medical decision to x-ray the plaintiff's left wrist, and she never denied a request from the plaintiff to have an x-ray (def. m.s.j., ex. 9, 10, 12).  The decision to x-ray the plaintiff's left wrist was made by a physician or a mid-level practitioner, who provided him medical care and treatment.  Additionally, the plaintiff's medical records reveal his wrist was diagnosed by a Mid-level Practitioner (def. m.s.j., ex. 9, p. 27; ex. 10).  The records do not reveal defendant Fuertes-Rosario diagnosed the plaintiff's wrist as being sprained or broken.  The medical records also do not support the plaintiff's bald allegation that defendant Fuertes-Rosario told him his wrist was not broken and sent him back to work, telling him the pain would go away.  As noted above in the facts section, defendant Fuertes-Rosario personally saw the plaintiff only once regarding the pain in his left wrist, i.e., on November 10, 2005, which was almost a year after he injured his wrist on September 23, 2004 (*id.* p. 87-88).

With regard to defendant Davis, the plaintiff alleges that "[o]n March 31, 2005, plaintiff received an incident report from Officer T. Davis (Cook Supervisor) for failing to mop out a deep freezer while wearing a cast.  The report resulted in disciplinary sanctions." Again, without more evidence or allegations against defendant Davis, this statement alone does not amount to an Eighth Amendment violation.  Defendant Davis, as a cook supervisor, is responsible for supervising inmates assigned to the Food Service Department (def. m.s.j., ex. 13).  Defendant Davis does not provide medical care or treatment to inmates.  Additionally, although defendant Davis remembers the plaintiff having a cast

18

and/or splint, he does not recall the plaintiff ever complaining about his wrist being broken or being forced to work in the Food Services Department.  Defendant Davis does not assign inmates to work details and does not place medical restrictions on inmates.

Clearly, the plaintiff's wrist injury is a serious medical need.  However, the plaintiff has failed to provide any evidence that the defendants were deliberately indifferent to that need and that he suffered any injury as a result of the defendants' actions. Accordingly, the claim fails.  Furthermore, as argued by the defendants, the plaintiff alleges, at most, that the defendants were negligent.  Even if the plaintiff could prove that the defendants were negligent, mere negligence does not constitute a constitutional violation. *Grayson*, 195 F.3d at 695  ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it.").

The plaintiff apparently claims that defendants Holt, Southeast Regional Director; LaManna, Warden at FCI Edgefield; and Fuertes-Rosario, Health Services Administrator at FCI Edgefield , are liable in their supervisory capacities (pl. resp. m.s.j. 5-6).  It is well settled that liability in civil rights cases brought under 42 U.S.C. § 1983 may not be premised upon a *respondeat superior* theory.  *See Polk County v. Dodson*, 454 U.S. 312, 325-26 (1981) and *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978).  The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate:  (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994).  As set forth above, the plaintiff has failed to show a constitutional injury inflicted by any of the defendants, and he has failed to

19

establish issues of material fact with regard to the three elements necessary for supervisory liability.  Accordingly, the plaintiff's claims against these supervisors fail.

The defendants further claim that they are entitled to qualified immunity.  This court agrees.  Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it.  *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation."  *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."  *Wilson*, 526 U.S. at 609.  If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist."  *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights.  Therefore, the defendants are entitled to qualified immunity.

20

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted.


s/William M. Catoe
United States Magistrate Judge

July 12, 2007

Greenville, South Carolina